T.C. Memo. 2021-95

UNITED STATES TAX COURT

GEORGE S. HARRINGTON, Petitioner <u>v.</u>
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 13531-18.                    Filed July 26, 2021.

<u>Mindy S. Meigs</u> and <u>Alexander H. Kugelman</u>, for petitioner.

<u>Julie Ann Fields</u> and <u>Pamela Grewal</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LAUBER, <u>Judge</u>:  With respect to petitioner's Federal income tax for 2005-2010, the Internal Revenue Service (IRS or respondent) determined deficiencies and civil fraud penalties as follows:

[*2]

| Year | Deficiency | Penalty sec. 6663 |
|------|-----------|-------------------|
| 2005 | $21,273 | $15,955 |
| 2006 | 1,174 | 6,892 |
| 2007 | 8,863 | 6,647 |
| 2008 | 83,900 | 62,925 |
| 2009 | 64 | 48 |
| 2010 | 2,623 | 1,967 |

The deficiencies result from the IRS' determination that petitioner failed to report $791,661 in offshore investment income. Petitioner's principal contention is that assessment is barred by the three-year period of limitations in section 6501(a).[1] Respondent argues that there is no period of limitations because the underpayments were due to fraud. See sec. 6501(c)(1). We hold that petitioner fraudulently underreported his income for some years but not others. We will thus sustain the deficiencies and the fraud penalties to the extent set forth herein.

FINDINGS OF FACT

These findings are based on the parties' joint stipulation of facts, the exhibits attached thereto, and the exhibits and testimony presented at trial. Petitioner resided in Colorado when he filed his petition. Absent stipulation to the contrary,

---

[1]Unless otherwise indicated, all statutory references are to the Internal Revenue Code in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure. We round all monetary amounts to the nearest dollar.

[*3] venue for appeal of this case would be the U.S. Court of Appeals for the Tenth Circuit. See sec. 7482(b)(1)(A).

A.    Background

Petitioner is a U.S. citizen and his wife, Monica Harrington, is a dual citizen of the United States and Germany. Mrs. Harrington also goes by the name Monica Schröder. They are now retired, splitting their time between the United States and New Zealand.

Petitioner earned a B.A. in engineering and worked in the forest product industry. He started his career in Newfoundland and Labrador, where he became involved with Eastern Wood Harvesters (EWH), which exported lumber to Europe. As a contractor for EWH petitioner procured lumber and delivered it to an EWH warehouse. He was supposed to be paid once the lumber was shipped, but shipment was often delayed due to icy conditions in the Canadian ports. Petitioner testified that EWH got behind in its payments and that he racked up many unpaid invoices. He told the revenue agent (RA) who conducted the examination that EWH at one point owed him more than $1 million.

Petitioner decided that his best chance of recovering this money was to become a full-time employee of the company. To that end, he learned as much as he could about EWH's operations. He then explained to the company's owners that

[*4] EWH had been grossly mismanaged and that he could right the ship. The owners agreed, instructing him to "take over the management."

In his new role petitioner became acquainted with John Glube, EWH's Canadian attorney. Mr. Glube was the architect behind EWH, which seems to have been structured to enable its European owners to minimize taxes imposed by Canada and their home countries. Mr. Glube had formed Malta, Ltd., a Cayman Islands entity, to serve as EWH's "operating and financial company." Under Malta's name he opened a bank account (Malta Account) with the Cayman Islands branch of the Royal Bank of Canada (RBC). Mr. Glube explained all of this to petitioner, who testified that he was impressed by Mr. Glube, who seemed "on the ball." Petitioner described Mr. Glube and his associates as "the most honorable people I have ever dealt with." Mr. Glube was later imprisoned for embezzlement.

B.     Petitioner's Offshore Investments

Petitioner sold his house at some point after meeting Mr. Glube and gave Mr. Glube a check for $350,000, the bulk of the proceeds. Mr. Glube arranged for this money to be deposited into a Union Bank of Switzerland (UBS) account under the name Reed International, Ltd. (Reed Account). It was a Cayman Islands entity incorporated in 1987, originally to hold assets for EWH.

[*5]   Petitioner testified that he lent this $350,000 to EWH as part of his effort to stabilize the company, by showing "potential creditors that * * * [EWH] had money in the bank."  There is no evidence that petitioner executed a loan agreement with Mr. Glube or EWH, and we did not find petitioner's testimony credible. We find that petitioner was impressed with Mr. Glube's proficiency at secreting assets in the Cayman Islands and wished to secure the same treatment for his $350,000 nest egg.

To the extent petitioner tried to turn EWH around, he did not succeed in doing so.  In the 1990s the European Union banned the import of North American softwood products, ultimately sinking EWH, which ceased operations in 1993 or 1994.  The record includes little evidence of petitioner's activities during the ensuing 10 years.

A UBS document dated May 2002 identified petitioner and his wife as the "beneficial owners" of the Reed Account.  In 2003 he traveled from New Zealand to the Cayman Islands and signed a variety of documents, one of which gave him a "power of attorney for the management of [Reed International's] assets."  Despite being a beneficial owner of the Reed Account and having a power of attorney to manage the company's assets, petitioner testified that he did not have "any access or control * * * to get the money back."  We did not find that testimony credible.

**[*6]** In 2007 the Reed Account was closed, apparently because Reed International was being dissolved. That same year Malta, Ltd., was dissolved, and the RBC Malta Account, in which petitioner had an interest, was also closed. Petitioner testified that he was promised "an allocation" from these accounts and that "the allocation occurred in 2007." Funds from both offshore accounts were then transferred to a UBS "conduit account" in Switzerland.

UBS bankers advised petitioner that, for "estate planning" purposes, the funds in his "conduit account" would be safer in a "stiftung," a European trustlike vehicle. Petitioner told the bankers he "thought that was a good idea * * * because it solved [his] estate planning dilemma." The funds were accordingly transferred to a UBS account under the name Schröder Stiftung, a newly formed Liechtenstein entity. (As noted earlier, petitioner's wife had also used the name Monica Schröder.) The Schröder Stiftung held these assets for the benefit of petitioner and his family.

In 2009 UBS closed the Schröder Stiftung account. In that year the U.S. Department of Justice entered into a deferred prosecution agreement with UBS "based on a charge of conspiracy to defraud the United States by impeding the IRS in the ascertainment, computation, assessment, and collection of income taxes during the period 2002-2007." Ian M. Comisky et al., Tax Fraud & Evasion,

[*7] para. 1.07[1] (2021), Westlaw TFE WGL. As part of this agreement UBS admitted that it had "participated in a scheme to defraud the United States * * * by actively assisting * * * [U.S. taxpayers] in establishing accounts at UBS in a manner designed to conceal * * * [their] ownership or beneficial interest." Ibid.

After informing petitioner that the Schröder Stiftung account would be closed, a UBS banker connected him with Marc-André Sola, a Swiss national. Mr. Sola advised petitioner to contribute the assets from the Schröder Stiftung account to a life insurance policy in Liechtenstein. Petitioner established two policies with Valor Life, a Liechtenstein entity, naming his wife and children as the beneficiaries. The aggregate value of the policies exceeded $3 million. Petitioner testified at trial that the decision to buy these policies was his.

In 2013 the Valor Life policies were canceled, and petitioner moved the assets to an account at LGT Bank, a Liechtenstein entity, under his wife's name. He testified that the account needed to be in his wife's name because "that bank wasn't accepting U.S. clients." He did not explain why he chose that particular bank or why he chose Liechtenstein generally.

C.    IRS Examination

For each year at issue petitioner himself prepared and filed with his wife a joint Federal income tax return. On these returns he reported no income attribut-

[*8] able to the offshore investment vehicles discussed above. In 2012 the IRS selected the couple's 2005-2010 returns for examination. The IRS initiated the examination on the basis of information and documents obtained from UBS pursuant to the deferred prosecution agreement. The IRS received 844 pages of information concerning UBS accounts held by or associated with petitioner. This material included bank records, investment account statements, letters, emails between petitioner and UBS bankers, summaries of telephone calls, and documentation concerning the entities through which the offshore assets were held.

These records show that money was moved among the RBC Malta Account and several UBS accounts, including the Reed Account, the Swiss "conduit account," and the Schröder Stiftung account. These documents identify petitioner as a UBS "client," as the beneficial owner of the Reed Account, and as the beneficiary (with his family) of the Schröder Stiftung and its investment account. The RA assigned to conduct the examination reviewed these records and ascertained that the transfers among the accounts were made, and that the assets in the accounts were held, for the benefit of petitioner and his family.

UBS supplied the IRS with copies of email communications between petitioner and UBS bankers. On March 17, 2005, petitioner emailed a UBS banker

[*9] stating that he was "very pleased with * * * [their] performance since '02" and that he was "very interested in, and flexible, concerning any suggestions * * * [the bankers] might have." On March 22, 2005, Philipp Bigger, a UBS banker, stated in a reply email that UBS had sent petitioner "the requested statements and two alternative investment ideas." Mr. Bigger asked for petitioner's telephone number so that they could discuss the two investment proposals.

In May 2005 petitioner confirmed receipt of the UBS package. He thanked Mr. Bigger for "the quality of management" but expressed some concern that his "assets, which include those under your care and elsewhere, are almost all positioned in equities." Mr. Bigger responded by saying that petitioner's "preferences for certain investments" helped him to understand petitioner's goals and "to adjust our initial proposal." Because petitioner expressed "concern regarding the equity exposure and the risk which comes along with it," Mr. Bigger suggested an investment in bond funds, while noting that UBS was "still fairly optimistic for the European stock markets." Upon reflection petitioner instructed Mr. Bigger to continue with the "present management scheme which is producing favorable results."

UBS records indicate that in February 2007 petitioner met with UBS bankers to close the Reed Account. These records confirm that "the main topic was the transfer from th[e] account into the new founded Foundation," viz., the Schröder

**[*10]** Stiftung. A Cayman Islands entity known as Campbell Directors, Ltd. (Campbell), had incorporated Reed International and supplied directors for it. UBS stated that "the client [viz., petitioner] will give instructions to [C]ampbell to have the account transferred via joint account and close it." Two months later Campbell directed UBS to "transfer all assets of Reed International, Ltd. to Mr. and Mrs. Harrington."

UBS records show that petitioner received account statements from UBS as early as 2003. On September 17, 2003, Campbell informed UBS that petitioner was on route to the Cayman Islands and would need to review a "portfolio statement" for the Reed Account. The next day Mr. Bigger transmitted to petitioner a "Statement of Assets" showing net assets of $1,216,690. Emails between Mr. Bigger and petitioner confirm that UBS sent petitioner more account statements in 2005.

The RA assigned to conduct the examination first interviewed petitioner in January 2013. Knowing that the IRS had likely received UBS bank records by that time, petitioner acknowledged the existence of the offshore bank accounts and life insurance policies. But he asserted that he had no control over any account and had never received financial statements for any account. He asserted that he had lent $350,000 to EWH and that, while he did not know where the loan pro-

**[\*11]** ceeds were, the money was supposed to have been placed in a Liechtenstein bank under his wife's name.

That same month petitioner contacted Mr. Sola and advised that the IRS was examining his tax returns. Petitioner stated that "my relationships with financial institutions, specifically bank accounts and financial instruments such as the Valor Life * * * [policies] will be disclosed." He asked Mr. Sola to structure a transaction that "would show a greater degree of continuity between 2012 and 2013 in disposition of funds, making the diversion to Schröder more explainable, and perhaps less embarrassing." The Valor Life policies were then canceled, and the funds were moved to LGT Bank under his wife's name.

The RA interviewed petitioner a second time in April 2013. During that interview petitioner retracted his prior statement that the proceeds of the purported $350,000 loan had been placed in a Liechtenstein bank; he said that he "must have misspoken." He instead asserted (for the first time) that his former business associates had run off with his money and that he had asked the U.S. Embassy in Switzerland for assistance in getting it back. He again represented that he had no control over any account and had received no financial statements for any account.

In September 2013 the RA conducted a phone interview with the lawyer who was then representing petitioner. The attorney represented that petitioner had

[*12] no records from UBS but that, once pertinent records had been secured, petitioner would file amended income tax returns and delinquent Reports of Foreign Banks and Financial Accounts (FBARs) as required by the Bank Secrecy Act. See 31 U.S.C. sec. 5314 (2012).

In August 2014 petitioner provided the RA with amended joint returns for 2005-2010. These amended returns, signed by petitioner and his wife, reflected previously unreported income of almost $800,000 from RBC and UBS accounts in the Cayman Islands and Switzerland. The income consisted of interest, dividends, and very substantial capital gains, particularly in 2005, 2007, and 2008. On May 7, 2015, the IRS assessed tax of $8,015 for 2006 on the basis of petitioner's amended return for 2006, which reported a tax liability of $8,033.

Petitioner also supplied the RA with copies of FBARs. The FBARs confirm that petitioner owned (separately or jointly with his wife) investment accounts with RBC, UBS, and LGT Bank in Liechtenstein, and that petitioner owned (separately or jointly with his wife) life insurance policies with Valor Life. The FBARs disclosed the following financial information:

**[*13]**

| Year | Institution | Highest account balance |
|------|-------------|------------------------|
| 2005 | RBC | $1,260,837 |
| 2005 | UBS | 1,462,340 |
| 2006 | RBC | 1,474,238 |
| 2006 | UBS | 1,769,130 |
| 2007 | RBC | 1,410,188 |
| 2007 | UBS | 1,864,451 |
| 2008 | UBS | 3,249,734 |
| 2009 | Valor Life | 3,052,964 |
| 2013 | LGT Bank | 2,906,432 |
| 2014 | Bank of N.Z. | 18,897 |

When submitting his original returns for 2005-2010, petitioner had filed FBARs disclosing bank accounts in New Zealand, where he and his wife resided part of the year. But he did not disclose on these previously filed FBARs any financial accounts in the Cayman Islands, Switzerland, or Liechtenstein. The RA found it suspicious that petitioner had disclosed the New Zealand accounts, which held relatively low balances, but had failed to disclose the other accounts, which held more than $3 million.

At the RA's request, petitioner for 2007-2010 also filed Forms 3520, Annual Return To Report Transactions With Foreign Trusts and Receipt of Certain Foreign Gifts. The Form 3520 for 2007, which petitioner signed as "Owner/Beneficiary," identified gratuitous transfers of $503,190 and $3,451,323 to the Schröder Stiftung for the benefit of petitioner, his wife, and their two children.

[*14] Petitioner also executed Forms 3520-A, Annual Information Return of Foreign Trust With a U.S. Owner, on behalf of the Schröder Stiftung.

After completing her interviews with petitioner, the RA compiled her interview notes into an April 2015 memorandum, which petitioner read and signed a few months later. According to this memorandum petitioner averred that he had no control over the Reed Account, that he had received no account statements from UBS, and that he had no meaningful contact with UBS bankers. He averred that, after the Reed Account was closed, assets in the account were moved to a Swiss conduit account without his knowledge. He suggested that UBS directed him to move assets from the conduit account into a newly formed stiftung but said he "did not recall" being a beneficiary of the stiftung. He told the RA that he had no control over the Schröder Stiftung and that UBS unilaterally closed its bank account in 2009 because "they didn't want American investors anymore."

According to the RA's memorandum, petitioner admitted that, on advice from UBS, he had contacted Mr. Sola to discuss moving the offshore assets into Valor Life policies, allegedly for "estate planning" purposes. Petitioner averred that he had no control over these policies and that they were canceled in 2013 because "the Swiss agency that sold the * * * policies did not want Americans as customers."

[*15] Using a "sampling method" analysis, the RA compiled all of this information and determined that petitioner had received, but failed to report, $791,661 in offshore investment income. The RA identified numerous disbursements from and transfers among the offshore accounts. Although petitioner did not withdraw any money personally, the RA concluded that he controlled the accounts, that all transactions were made for his benefit, and that he was currently taxable on the dividends, interest, and capital gains realized within the accounts.

In March 2016 the RA prepared a Civil Penalty Approval Form. On that form she recommended that the IRS impose fraud penalties under section 6663 for 2005-2010. She forwarded the case file, including the Civil Penalty Approval Form, to Kimberly Slack, her supervisor.

On March 17, 2016, Ms. Slack, in her capacity as "Group Manager," signed the Civil Penalty Approval Form, approving assertion of fraud penalties. On March 22, 2016, Jana Stout, a Fraud Technical Advisor, approved those penalties. At trial respondent introduced into evidence the RA's case activity record and internal IRS emails to verify the date on which Ms. Slack approved the penalties.

On April 20, 2016, the RA sent petitioner a closing letter. The RA attached to her letter a Form 4549, Income Tax Discrepancy Adjustments, dated April 14,

[*16] 2016. These documents formally communicated to petitioner the Examination Division's decision to assert fraud penalties.

On April 11, 2018, the IRS issued petitioner a notice of deficiency for 2005-2010, and he timely petitioned for redetermination.[2] The notice determined deficiencies totaling $117,897 and fraud penalties totaling $94,434. The fraud penalty for 2006, or $6,892, was based on the total underpayment the IRS had determined for 2006, consisting of $8,015 assessed in May 2015 plus the deficiency determined in the notice of deficiency (($8,015 + $1,174) × 0.75 = $6,892).[3]

A portion of the 2007 deficiency resulted from failure to report $11,466 of income received by petitioner's wife from two U.S. payors, Merrill Lynch and National Financial Services, LLC. At trial the RA testified that she did not believe petitioner had intentionally failed to report these items.

---

[2]The IRS issued a separate notice of deficiency to petitioner's wife, and her case was docketed at docket No. 13530-18. The IRS determined no fraud penalty against Mrs. Harrington, concluding that no part of the underpayment was due to fraud on her part. See sec. 6663(c). In her petition Mrs. Harrington challenged the negligence penalties determined by respondent and also requested relief from joint and several liability under section 6015(b) and (e). The latter request was forwarded for consideration by respondent's centralized office, the Cincinnati Centralized Innocent Spouse Operation.

[3]The notice of deficiency stated that, "to the extent that it is determined that fraud does not apply to any portion of the underpayment, you are liable for an accuracy-related penalty under section 6662(a)." Respondent has since conceded the accuracy-related penalties.

[*17]                                        OPINION

I.      <u>Unreported Income</u>

Section 61(a) provides that gross income "means all income from whatever source derived," including gains derived from dealings in property, interest, and dividends. Sec. 61(a)(3), (4), (7). In cases of unreported income, the Commissioner must establish "a minimal evidentiary foundation" connecting the taxpayer with the income-producing activity. See United States v. McMullin, 948 F.2d 1188, 1192 (10th Cir. 1991). Once the Commissioner has established some evidentiary foundation, the burden of proof shifts to the taxpayer to prove by a preponderance of the evidence that the Commissioner's determinations are arbitrary or erroneous. See Erickson v. Commissioner, 937 F.2d 1548, 1551-1552 (10th Cir. 1991), aff'g T.C. Memo. 1989-552; Doyal v. Commissioner, 616 F.2d 1191, 1192 (10th Cir. 1980), aff'g T.C. Memo. 1978-307.

To satisfy his burden respondent introduced extensive banking records obtained during the examination. These records establish that in 2005-2010 petitioner derived substantial income from foreign investment vehicles. Respondent also produced petitioner's amended joint returns for 2005-2010. On these returns petitioner admitted that he received, but did not report, substantial interest, dividend, and capital gain income from the RBC and UBS accounts. Respondent has there-

[*18] fore supplied a "minimal evidentiary foundation," McMullin, 948 F.2d at 1192, that connects petitioner with unreported income.  Petitioner thus bears the burden of proving that respondent's determinations of unreported income are arbitrary or erroneous.[4]

Petitioner does not dispute that the offshore accounts earned large amounts of investment income.  Rather, he contends that he is not subject to tax because he had no control over the accounts.  We are not persuaded.  Petitioner was listed as the "beneficial owner" of the Reed Account, and he himself signed a document obtaining "power of attorney for the management of [Reed International's] assets." The bank records admitted into evidence show that petitioner was a UBS client. In that capacity he received and reviewed account statements, instructed UBS bankers to consider new investment strategies, closed accounts, opened others, and transferred assets between them.

---

[4]Petitioner argues that the presumption of correctness does not attach to the notice of deficiency because the deficiencies do not precisely match the sums he reported on his amended returns.  But the IRS did not rely exclusively on the amended returns.  Rather, using a "sampling method," the RA computed the deficiencies by reviewing the bank records in conjunction with the amended returns. See Petzoldt v. Commissioner, 92 T.C. 661, 687 (1989) (holding that the IRS has great latitude in reconstructing a taxpayer's income, and the reconstruction "need only be reasonable in light of all surrounding facts and circumstances").

[*19] The bank records show that petitioner owned the accounts and exercised significant control over them. In connection with closure of the Reed Account in 2007 a UBS banker stated that petitioner "will give instructions to [C]ampbell," which promptly closed the account and directed UBS to "transfer all assets * * * to Mr. and Mrs. Harrington." Petitioner filed FBARs showing that he or his wife owned RBC and UBS accounts in the Cayman Islands and Switzerland. In 2007 the assets in those accounts were moved to the Swiss "conduit account," and petitioner directed that the funds be invested in the Schröder Stiftung account, of which he and his family were the beneficiaries. When UBS closed the latter account, petitioner directed that the funds be invested in the Valor Life policies, of which he and his family were again the beneficiaries. This course of conduct plainly shows that petitioner had the requisite control. See Rutkin v. United States, 343 U.S. 130, 137 (1952) (holding that a gain "constitutes taxable income when its recipient has such control over it that, as a practical matter, he derives readily realizable economic value from it").

It is inconsequential that petitioner did not personally "make withdrawals" or "receive disbursements" from the accounts. A taxpayer need not actually withdraw cash for an investment gain to be taxable. See sec. 1.451-2(a), Income Tax Regs. ("Income although not actually reduced to a taxpayer's possession is con-

[*20] structively received by him in the taxable year during which it is credited to his account, set apart for him, or otherwise made available so that he may draw upon it at any time[.]").  Petitioner supplied no documentary evidence to show that his ability to draw on any of the accounts was "subject to substantial limitations or restrictions."  Ibid.  In any event, to the extent that there were restrictions on petitioner's ability to make routine withdrawals, we find that he willingly divested himself of that power in order to conceal his offshore assets.  See Murphy v. United States, 992 F.2d 929, 931 (9th Cir. 1993) (holding that a taxpayer constructively received income where "his failure to receive cash was entirely due to his own volition").

In sum, we find that petitioner has not carried his burden of proving that respondent's determinations of unreported income are "arbitrary or erroneous." See Erickson, 937 F.2d at 1554-1555.  We accordingly sustain the deficiencies to the extent assessment is not barred by the period of limitations.

II.     Existence of Fraud

Section 6501(a) generally requires the IRS to assess a tax within three years after the return was filed.  The period of limitations is extended to six years where the taxpayer omits from gross income an amount "in excess of 25 percent of the amount of gross income stated in the return."  Sec. 6501(e)(1)(A)(i).  The notice of

**[*21]** deficiency in this case was issued on April 11, 2018, more than six years after the period of limitations began to run for 2010, the last year at issue. (The original return for 2010 was filed on May 23, 2011.)

However, section 6501(c)(1) provides that, where a taxpayer has filed "a false or fraudulent return with the intent to evade tax," there is no period of limitations and the tax "may be assessed * * * at any time." "[T]he determination of fraud for purposes of the period of limitations on assessment under section 6501(c)(1) is the same as the determination of fraud for purposes of the penalty under section 6663." Neely v. Commissioner, 116 T.C. 79, 85 (2001). Whether the underpayments at issue were due to fraud thus determines both whether petitioner is liable for the civil fraud penalties and whether respondent can assess the deficiencies.

A. Supervisory Approval

Section 6751(b)(1) provides that "[n]o penalty under this title shall be assessed unless the initial determination of such assessment is personally approved (in writing) by the immediate supervisor of the individual making such determination." As a threshold matter, respondent must show that he complied with section 6751(b)(1). See Chai v. Commissioner, 851 F.3d 190, 221 (2d Cir. 2017) (ruling

[*22] that "compliance with § 6751(b) is part of the Commissioner's burden of production"), aff'g in part, rev'g in part T.C. Memo. 2015-42.

In Belair Woods, LLC v. Commissioner, 154 T.C. 1, 14-15 (2020), we explained that the "initial determination" of a penalty assessment is typically embodied in a letter "by which the IRS formally notifie[s] * * * [the taxpayer] that the Examination Division ha[s] completed its work and * * * ha[s] made a definite decision to assert penalties." Once the Commissioner introduces evidence sufficient to show written supervisory approval, the burden shifts to the taxpayer to show that the approval was untimely, i.e., "that there was a formal communication of the penalty [to the taxpayer] before the proffered approval" was secured. Frost v. Commissioner, 154 T.C. 23, 35 (2020).

Respondent has produced the Civil Penalty Approval Form (Form) that recommended assertion of fraud penalties for 2005-2010. In the box captioned "Reason(s) for Assertion of Penalty(s)," the RA wrote, "see civil fraud penalty lead sheet 17a." There is no mention in that box of any negligence penalties. On the "civil fraud penalty lead sheet," which was seven pages long, the RA set forth her justification for imposing fraud penalties.

The RA's immediate supervisor, Kimberly Slack, signed the Form as the "Group Manager." She thereby supplied her "Approval to Assess Penalties Iden-

[*23] tified Above," i.e., fraud penalties. On the signature line Ms. Slack inscribed a handwritten date of March 17, 2016.

The definite decision to assert fraud penalties was communicated to petitioner a month later, in a closing letter dated April 20, 2016, with an attached Form 4549 showing the penalty calculation. The Form 4549 was dated April 14, 2016, and the parties agree that this is the relevant date for section 6751(b)(1) purposes. Respondent has thus met his initial burden of showing timely approval. See Frost, 154 T.C. at 35; Belair Woods, 154 T.C. at 15.

Petitioner does not contend that "there was a formal communication of the [fraud] penalty before the proffered approval" on March 17, 2016. Cf. Frost, 154 T.C. at 35. Rather, petitioner contends that Ms. Slack fraudulently backdated the Form. In support of that position petitioner points to a typed date of June 14, 2016, which appears in the upper right-hand corner of the Form.

There is no evidence to suggest that the RA and her supervisor engaged in a concerted effort to falsify documents. "The presumption of regularity supports the official acts of public officers and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." Pietanza v. Commissioner, 92 T.C. 729, 739 (1989), aff'd without published opinion, 935

[*24] F.2d 1282 (3d Cir. 1991).  Petitioner has offered no "clear evidence to the contrary."

The RA's case activity record is fully consistent with her having secured supervisory approval for the fraud penalties on March 17, 2016.  Her entry for February 29, 2016, shows that she "[w]orked on [f]raud penalty write up" and "[d]iscussed [it] with mgr and gave to her to review."  The entry for March 8 indicates that the RA "made changes and wrote argument for fraud penalty write up."  The next day she "made changes again, researching and adding court cases to reasonable cause argument."  The entry for March 16 states that the RA "[h]ad manager review and submitted to fraud coordinator with F[orm] 11661 to get fraud approval."  The entry for March 22 states that "the FTA [i.e., the fraud technical advisor] sent back F[orm] 11661 with her approval."[5]

Respondent has produced internal IRS emails confirming the accuracy of the entries on the RA's case activity record.  On March 16 the RA emailed Ms. Slack and Jana Stout (the fraud technical advisor) a copy of "the Harrington case for your review and approval of the fraud penalty."  The next day Ms. Stout re-

---

[5]Form 11661, Fraud Development Recommendation--Examination, "documents the FTA's involvement and places a case in fraud development status." Internal Revenue Manual pt. 25.1.2.2(2) (June 9, 2015); see Benavides & Co., P.C. v. Commissioner, T.C. Memo. 2019-115, 118 T.C.M. (CCH) 221, 232 (holding that a signed "Form 11661 evinces supervisory approval").

[*25] quested a revised Form 11661 signed by "your manager * * * with current date," i.e., March 17. Later that day the RA returned to Ms. Stout a document that bore Ms. Slack's signature and that day's date. On March 22 Ms. Stout stated that the "[w]rite up looks good" and that she had "[a]pproved CFP."

Petitioner has not carried his burden of proof to show that supervisory approval of the fraud penalties was untimely. See Frost, 154 T.C. at 35. Although the record does not explain the June 14, 2016, date shown at the top of the Form, that may have been the date on which the RA updated the Form to add "Alternate Position: Negligence Penalty," which is not mentioned on the cover sheet in the box captioned "Reason(s) for Assertion of Penalty(s)." Alternatively, June 14, 2016, may show the date on which the RA "finalized lead sheets and closing reports," as she stated in her case activity record for that date. Because petitioner has offered no "clear evidence" to establish a backdating of the supervisor's signature on the Form, see Pietanza, 92 T.C. at 739, we conclude that respondent has satisfied the requirements of section 6751(b)(1).

B. Fraud Penalty

"If any part of any underpayment of tax required to be shown on a return is due to fraud," section 6663(a) imposes a penalty of 75% of the portion of the underpayment attributable to fraud. Respondent has the burden of proving fraud,

[*26] and he must prove it by clear and convincing evidence.  Sec. 7454(a); Rule 142(b).  To sustain his burden, respondent must establish two elements:  (1) that there was an underpayment of tax for each year at issue and (2) that at least some portion of the underpayment for each year was due to fraud.  Hebrank v. Commissioner, 81 T.C. 640, 642 (1983).

Where the Commissioner determines fraud penalties for multiple tax years, his burden of proving fraud "applies separately for each of the years."  Vanover v. Commissioner, T.C. Memo. 2012-79, 103 T.C.M. (CCH) 1418, 1420 (quoting Temple v. Commissioner, T.C. Memo. 2000-337, 80 T.C.M. (CCH) 611, 618, aff'd, 62 F. App'x 605 (6th Cir. 2003)).  If the Commissioner proves that some portion of an underpayment for a particular year was attributable to fraud, then "the entire underpayment shall be treated as attributable to fraud" unless the taxpayer shows, by a preponderance of the evidence, that the balance was not so attributable.  Sec. 6663(b).

### 1.    Underpayment of Tax

During the examination petitioner submitted amended joint returns for 2005-2010.  Those amended returns show underpayments of tax for 2005-2009 totaling $103,756.  Petitioner thus has conceded that he underpaid his tax for those five years.  See Badaracco v. Commissioner, 464 U.S. 386, 399 (1984) ("An

[*27] amended return, of course, may constitute an admission of substantial underpayment[.]"). Although the IRS in the notice of deficiency determined underpayments in slightly different amounts, it need not "establish the precise amount of the deficiency" to satisfy the first prong. See DiLeo v. Commissioner, 96 T.C. 858, 873 (1991), aff'd, 959 F.2d 16 (2d Cir. 1992).

Petitioner argues that his "amended returns should be disregarded because * * * [he] would not have filed them had they not been requested by the revenue agent." Although the law is clear that "[s]tatements made in a tax return * * * may be treated as admissions," Lare v. Commissioner, 62 T.C. 739, 750 (1974), aff'd, 521 F.2d 1399 (3d Cir. 1975), petitioner asks that we create an exception to this rule where the taxpayer has been cooperative during an examination. We decline petitioner's invitation, finding no legal support for an exception of this kind.

Petitioner did not admit to any underpayment for 2010 on his amended return for that year. Respondent therefore must establish by clear and convincing evidence that petitioner underpaid his tax for 2010; respondent may not rely on a "presumption of correctness" to establish that fact. See DiLeo, 96 T.C. at 873; Petzoldt v. Commissioner, 92 T.C. 661, 700 (1989). The parties agree that the deficiency for 2010 was based on the IRS' partial disallowance of a claimed capital loss carryforward.

[*28] The notice of deficiency shows that petitioner reported a net capital loss of $34,002 for 2009 and that this loss was adjusted downward during the examination by $1,688, to $32,314. Assuming that a $3,000 capital loss was allowed for 2009--the maximum permitted under section 1211(b)--petitioner had an available capital loss carryforward of $29,314 to 2010. But the IRS allowed petitioner a carryforward of only $12,039. Respondent introduced no factual evidence to support this adjustment and has not explained the rationale for it. Respondent has not produced a copy of petitioner's original return for 2010, and the amended return for 2010 supplies no information about petitioner's capital gains and losses. We accordingly conclude that respondent has failed to show, by clear and convincing evidence, that petitioner underpaid his tax for 2010. Respondent is thus barred from assessing the $2,623 deficiency and the $1,967 fraud penalty determined for that year. See sec. 6501(a), (c)(1); see also Neely, 116 T.C. at 85.

2. Badges of Fraud

We turn to the second element of the penalty, fraudulent intent. Fraud is intentional wrongdoing designed to evade tax believed to be owing. Neely, 116 T.C. at 86. The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Estate of Pittard v. Commissioner, 69 T.C. 391, 400 (1977). Fraud is not to be presumed or based upon mere suspicion. Petzoldt,

[*29] 92 T.C. at 699-700. But because direct proof of a taxpayer's intent is rarely available, fraudulent intent may be established by circumstantial evidence. Id. at 699. Respondent satisfies his burden of proof by showing that "the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes." Parks v. Commissioner, 94 T.C. 654, 661 (1990). The taxpayer's entire course of conduct may be examined to establish the requisite intent, and an intent to mislead may be inferred from a pattern of conduct. Webb v. Commissioner, 394 F.2d 366, 379 (5th Cir. 1968), aff'g T.C. Memo. 1966-81; Stone v. Commissioner, 56 T.C. 213, 224 (1971).

Circumstances that may indicate fraudulent intent, often called "badges of fraud," include but are not limited to: (1) understating income, (2) keeping in-adequate records, (3) giving implausible or inconsistent explanations of behavior, (4) concealing income or assets, (5) failing to cooperate with tax authorities, (6) engaging in illegal activities, (7) supplying incomplete or misleading informa-tion to a tax return preparer, (8) providing testimony that lacks credibility, (9) fil-ing false documents (including false tax returns), (10) failing to file tax returns, and (11) dealing in cash. See Schiff v. United States, 919 F.2d 830, 833 (2d Cir. 1990); Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), aff'g T.C. Memo. 1984-601; Parks, 94 T.C. at 664-665; Recklitis v. Commissioner, 91

**[\*30]** T.C. 874, 910 (1988); <u>Morse v. Commissioner</u>, T.C. Memo. 2003-332, 86 T.C.M. (CCH) 673, 675, <u>aff'd</u>, 419 F.3d 829 (8th Cir. 2005). No single factor is dispositive, but the existence of several factors "is persuasive circumstantial evidence of fraud." <u>Vanover</u>, 103 T.C.M. (CCH) at 1420-1421.

Several of these factors are neutral or inapposite here. Petitioner did not engage in illegal activities. Since he prepared his own tax returns, he had no occasion to supply information to a return preparer. He did not deal extensively in cash--given the character of the income, that would have been impossible--and he did not altogether fail to file tax returns. But after thorough review of the record, we conclude that seven of the badges demonstrate that petitioner acted with fraudulent intent.

### a. Understating Income

A pattern of substantially understating income for multiple years is strong evidence of fraud, particularly if the understatements are not satisfactorily explained. <u>See Vanover</u>, 103 T.C.M. (CCH) at 1421. Petitioner failed to report five years' worth of income earned on investments in the Cayman Islands and Switzerland. This income, nearly $800,000, took the form of interest, dividends, and capital gains. The volume of this income was extremely large relative to the in-

[*31] come that petitioner actually reported on his original returns for 2005-2009, which totaled roughly $170,000.

Petitioner knew that he had earned income on these investments. Indeed, during the examination he filed amended returns admitting that he underpaid his tax by $103,756 for the years at issue. These facts provide strong evidence of fraudulent intent.

### b. Keeping Inadequate Records

Petitioner failed to maintain and supply to the IRS adequate records of his offshore assets and income. He repeatedly told the RA that he had never received statements for those investment accounts. That assertion was false: The evidence established that he received statements from UBS at least intermittently, on an "as needed" basis, when certain decisions had to be made. To the extent that he did not receive regular monthly statements, we find that this was part of the tax-avoidance strategy that he implemented with UBS, hoping that the absence of records, coupled with Swiss bank secrecy laws, would prevent discovery of the offshore accounts. See Meier v. Commissioner, 91 T.C. 273, 302 (1988) (holding that a taxpayer's inadequate record keeping evidences an intent "to conceal information" from the IRS).

**[*32]**     c.     <u>Giving Implausible or Inconsistent Explanations</u>

Petitioner is a sophisticated businessman and investor, but he offered to the IRS and the Court a variety of implausible and inconsistent explanations about his income and assets. To start, the seed money for the Reed Account came from the $350,000 that he gave Mr. Glube, an attorney. Petitioner told the RA that he sold his house and lent the proceeds to EWH to improve its credit standing. But he also said that EWH owed him more than $1 million for services he had performed as a contractor.

It is hard to believe that a savvy businessman would give an attorney $350,000 to backstop a floundering business that was not paying his invoices. And it is hard to believe that petitioner would part ways with such a large sum without executing a loan agreement. Especially is that so when he was dealing with a lawyer, who would have understood the need for a loan document and could easily have drafted one.

Petitioner also provided inconsistent explanations about the whereabouts of the funds he had purportedly lent. During one interview he told the RA that he had no idea where his money was. During another interview he asserted that his former business associates had taken his money and that he was trying to track them down. But these interviews took place more than 15 years after EWH's de-

[*33] mise; it is inconceivable that petitioner was attempting to recover any money from his former EWH associates at that point. Indeed, petitioner testified that he had already received, in 2007, "an allocation" following EWH's dissolution.

Nor did petitioner provide consistent explanations of his connections with the various bank accounts. While he acknowledged the existence of the accounts, he told the RA that he did not remember being a beneficial owner or having control over any account. When asked about his trip to the Cayman Islands in 2003, he admitted that he met with UBS bankers, but he represented that he did not know why he had been summoned there. He admitted that he had signed some documents on that trip, but he stated that he did not remember what he had signed. When the RA refreshed his memory--that the documents identified him as a beneficial owner and gave him power of attorney over Reed International--he said that he should have read the documents more carefully.

At trial petitioner changed his story, explaining that, while he may have had beneficial ownership, he never agreed to be a UBS client. That explanation was likewise implausible: The banking records show that he received account statements from UBS and that he communicated with UBS bankers--in person, over the phone, and by email--to discuss investment options. When confronted with this

[*34] evidence petitioner again tweaked his story, conceding that he was a "de facto" client but asserting that UBS had complete autonomy over the accounts.

We found the latter testimony completely implausible. In 2005 petitioner asked UBS to reduce his equity exposure, while ultimately opting to retain the "present management scheme which is producing favorable results." The assets in the Malta and Reed Accounts were transferred to a UBS "conduit account" in 2007 and then directed into the Schröder Stiftung for "estate planning" purposes. Petitioner told the UBS bankers that he thought this "was a good idea * * * because it solved [his] estate planning dilemma." And when the IRS notified him of the audit, he instructed one of his advisers to devise a transaction that would "mak[e] the diversion to Schröder [Stiftung] more explainable, and perhaps less embarrassing." All of these statements show petitioner's awareness that he had control over the accounts. In the light of these repeated inconsistencies, we find that this badge supplies strong evidence of fraudulent intent.

### d. Concealing Income or Assets

A willful attempt to evade tax may be inferred from a taxpayer's concealment of income or assets. Spies v. United States, 317 U.S. 492, 499 (1943). This case presents a paradigm of asset concealment. During 2002-2007, the years for which UBS admitted that it facilitated U.S. tax evasion, petitioner held millions of

[*35] dollars in offshore UBS accounts. These accounts were held in the names of shell companies and fictitious entities, as well as a German family name used by his wife. It is obvious that petitioner desired to conceal his ownership of these assets.

Petitioner's offshore accounts were situated in tax havens (the Cayman Islands and Liechtenstein) and countries known for their strict bank secrecy laws (Switzerland). Petitioner admitted at trial that he knew some people viewed these countries as "tax havens," but he represented that he held accounts there because they were centers for "international trading companies." But in 2003, when petitioner took over the Reed Account, EWH had been defunct for about 10 years, and from then on he had no relationship with any "international trading company."

Petitioner told the RA that he rolled the Schröder Stiftung account into the Valor Life policies because UBS "didn't want American investors anymore." He stated that those policies were canceled in 2013 because "the Swiss agency that sold the * * * polic[ies] did not want Americans as customers." He then moved his assets to a Liechtenstein bank account in his wife's name. He testified that the account needed to be in his wife's name because "that bank wasn't accepting U.S. clients." At any of these points petitioner could have moved his assets to one of his United States or New Zealand bank accounts. He declined to do so. Rather,

**[\*36]** he repeatedly went out of his way to conceal his assets in places where he knew they would be difficult to find.

The clearest indication that petitioner attempted to conceal assets is that he knowingly did conceal assets. As evidenced by his timely filing of FBARs reporting (very modest) balances in New Zealand banks, petitioner knew of his obligation to file FBARs reporting foreign financial accounts. But before the IRS audit he had never filed an FBAR disclosing any of his holdings in the Cayman Islands, Switzerland, or Liechtenstein.

In support of his position petitioner cites Zell v. Commissioner, 763 F.2d 1139 (10th Cir. 1985), aff'g T.C. Memo. 1984-152. The taxpayer in that case advanced tax protester arguments, urging that the internal revenue laws were unconstitutional, and he also falsely claimed on his return that he was entitled to 13 personal exemptions. Id. at 1145. Sustaining fraud penalties, the Tenth Circuit held that, while "the filing of protest returns" will not justify fraud penalties, an "affirmative act of concealment or misrepresentation" will do so. Id. at 1145-1146.

Zell does not help petitioner because he, like the taxpayer there, committed affirmative acts of concealment and misrepresentation. He filed false returns that omitted the vast bulk of his income. He concealed assets in the Cayman Islands, Switzerland, and Liechtenstein, with each account titled in a fictitious or mislead-

[*37] ing name. He misrepresented facts to the IRS, stating that he had never received an account statement from UBS and that he had no control over any offshore account. His entire course of conduct reveals a deliberate intent to conceal assets.

### e.    Failure To Cooperate With Tax Authorities

Petitioner contends that he cooperated with the IRS by acknowledging his offshore accounts in his first meeting with the RA. But that meeting occurred four years after UBS had entered into a deferred prosecution agreement and supplied its customers' bank records to U.S. authorities. Those facts were widely publicized, and petitioner knew that his ownership of UBS accounts almost certainly triggered the IRS audit. Under these circumstances, his acknowledgment that the offshore accounts existed is most plausibly regarded, not as a sincere act of cooperation, but as a strategic gambit.

In reality petitioner attempted to obfuscate facts and mislead the RA during the examination. At one point he told her that he did not know where his money was, speculating that Mr. Glube or his former business associates stole it. This was clearly false. The bank records show that his money was at UBS and that he was in active contact with UBS bankers regarding its management, informing them at one point that he was "very pleased with * * * [their] performance."

**[\*38]** Second, petitioner represented that he had only vague and limited familiarity with Reed International and the Reed Account. But in 2003 he flew from New Zealand to the Cayman Islands to obtain "power of attorney for the management of [Reed International's] assets." And in 2007 he met with UBS bankers to close the Reed Account, which held his original $350,000 nest egg and $800,000 of gains that had accrued on it. Most people tend to remember facts like this.

Third, petitioner told the RA that he had never been issued bank statements for any offshore account. That averment was plainly false: The bank records show that UBS had been sending him statements at least since 2003. Emails confirm that UBS sent him more statements in 2005. He told UBS bankers that he was "very pleased with \* \* \* [their] performance"; it is hard to understand how he could have offered that assessment without viewing account statements. And during the examination he was able to procure enough information to fill out FBARs and amended returns reporting almost $800,000 of offshore income. He could not explain how he was able to do this lacking access to financial statements.

Finally, petitioner repeatedly told the RA that he had no control over any account. Those statements were clearly false. As explained supra pp. 18-19, petitioner plainly had (and knew that he had) control over the offshore accounts, as

[*39] evidenced (among other things) by his repeated directions that funds be rolled over from one investment vehicle to the next.

### f. Lack of Credibility of Taxpayer's Testimony

We did not find petitioner to be a credible witness. He was often evasive or dismissive of questions that respondent's counsel and the Court asked of him. We have noted above numerous points on which we found his testimony to lack credibility.

Petitioner acknowledges inconsistencies in his testimony. But he urges that these lapses were attributable to the fact that he "was 88 years old at the time of trial" and that "many of the events at issue occurred 10 to 35 years before the trial began." We are not persuaded. Petitioner testified intelligently at trial; he did not simply misremember a few trivial facts, but mischaracterized facts and events of critical importance. He may have conceivably forgotten that he signed a particular document in 2003, but he cannot have "forgotten" that he had control over off-shore investments worth $3 million.

### g. Filing False Documents

Petitioner has admitted that the returns he originally filed for 2005-2009 omitted almost $800,000 of income. These omissions were large, both in absolute terms and relative to the income he did report (roughly $170,000 in the aggregate).

[*40] The FBARs he originally filed for each year were incomplete (and thus substantially false), reporting trivial assets in New Zealand and omitting massive assets in the Cayman Islands, Switzerland, and Liechtenstein. The false documents supply further evidence of fraudulent intent.

### C. Petitioner's Arguments

The section 6663 penalty does not apply to any portion of an underpayment "if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to * * * [it]." Sec. 6664(c)(1). The decision as to whether the taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs. Circumstances that may signal reasonable cause and good faith "include an honest misunderstanding of fact or law that is reasonable in light of all of the facts and circumstances, including the experience, knowledge, and education of the taxpayer." Ibid.

Petitioner contends that his underpayments were attributable to "good faith misunderstanding of the tax laws." He argues that he did not believe he had gross income because he could not (and did not) withdraw funds from his offshore investment accounts or otherwise exercise control over them. But as explained supra pp. 18-19, petitioner plainly had (and knew that he had) control over the ac-

[*41] counts because he repeatedly authorized moving assets among them. And it is common knowledge that individuals are taxable on income earned in an investment account--e.g., dividends and capital gains reinvested in a mutual fund--regardless of whether that income is withdrawn or currently distributed to them in cash. To the extent petitioner relinquished authority to make regular, routine withdrawals, that restriction was self-imposed and existed only to confuse U.S. tax authorities. Petitioner was an experienced businessman and investor. We find no support for the notion that he genuinely misunderstood the requirements of U.S. tax law.

Petitioner contends that respondent's failure to produce the original tax returns filed by petitioner and his wife "is fatal to the Commissioner's fraud case." Again we disagree. In Estate of Clarke v. Commissioner, 54 T.C. 1149, 1163 (1970), the Commissioner did not produce the taxpayer's original returns, but we nevertheless sustained the fraud penalty because "there was sufficient [secondary] evidence as to what the returns contained." Included among this secondary evidence was a "Certificate of Assessment and Payments showing the amount of tax due." Ibid. Respondent in this case has produced Certificates of Assessment and Payment for 2005-2009. He has also produced petitioner's amended returns,

**[\*42]** which show the amounts reported on the original returns. This evidence is more than sufficient to sustain the fraud penalty.

Finally, petitioner argues that, "even if the Court finds fraud, the entire underpayment is not due to fraud." Section 6663(b) provides that "[i]f the Secretary establishes that any portion of an underpayment is attributable to fraud, the entire underpayment shall be treated as attributable to fraud, except with respect to any portion of the underpayment which the taxpayer establishes (by a preponderance of the evidence) is not attributable to fraud."

Petitioner alleges that "the deficiency determination for 2007 includes unreported income from * * * domestic investment accounts." The unreported income determined for 2007 in the notice of deficiency includes interest and dividends totaling $30,514. The RA's workpapers show that $11,466 of this total consisted of interest and dividends received by petitioner's wife from Merrill Lynch and National Financial Services, LLC. At trial the RA admitted that she did not believe that petitioner or his wife had intentionally failed to report these payments. We find that petitioner has carried his burden to establish that this portion of the underpayment was "not attributable to fraud." See sec. 6663(b).

In sum, we conclude that respondent has established by clear and convincing evidence that the underpayments of tax for 2005, 2006, 2008, and 2009, and a

**[*43]** portion of the underpayment for 2007, were attributable to fraud. Because respondent has not established by clear and convincing evidence that petitioner underpaid his tax for 2010, petitioner is not liable for that year's fraud penalty, and respondent is barred under section 6501(a) from assessing any deficiency for that year. Because a portion of the underpayment for 2007 was not attributable to fraud, a Rule 155 computation will be necessary.

To reflect the foregoing,

<u>Decision will be entered under</u>

<u>Rule 155</u>.